## HUDSON COUNTY OYER AND TERMINER.

### AUGUST TERM, 1846.

#### THE STATE v. ELIPHELET M. S. SPENCER.

On Indictment for the Murder of Adeline M. Spencer.

1. It is no ground of *principal* challenge to a juror, that he has expressed an opinion on the matter to be tried, if it was not done through ill will or malice.

State v. Spencer.

2. A juror cannot be asked whether he has expressed an opinion on the issue.

3. A hypothetical opinion formed by a juror from the facts which he has heard is no cause of challenge.

4. The test of insanity in criminal cases is, whether the accused, at the commission of the crime, was conscious that he was doing what he ought not to do.

5. The burden of the proof of insanity is on the accused. To excuse crime, the jury ought to be satisfied of the insanity beyond reasonable doubt.

6. Partial insanity on other subjects does not excuse crime.

7. That accused had formerly been insane no excuse, if he had once recovered from it; but the continuance of insanity presumed in law unless a lucid interval be shown.

8. Declaration of deceased no evidence of insanity of the accused.

The Clerk being about to call the panel of jurors returned for the trial of the prisoner, the Presiding Judge (HORNBLOWER, C. J.,) said that in view of difficulties and delays that had occurred on former occasions, in consequence of a *departure* from the law of challenges to jurors, he felt it his duty to state that on the present occasion, so far as he was concerned, the court would be governed by the law of challenges, as it is found in books of acknowledged and constitutional authority in this State. He would therefore state what he deemed to be the law of challenges in this State, so far as that law is derived from our books of authority and adjudged cases.

He then proceeded to enumerate and explain the various grounds of challenge to particular jurors, concluding as follows:

Challenges *propter affectum* are of two kinds: principal challenges, to be tried by the court; and challenges to the favor, to be tried and decided by triors.

A principal challenge *propter affectum* is founded amongst other things, on the fact that the juror is related, or of kin or affinity to one of the parties, within the ninth degree; *or* that he has given a verdict in the same cause or on the same matter; *or* that he has declared his opinion of the case beforehand.

Challenges to the favor are grounded on some facts or circumstances, showing a probability that the juror is favorable to the one party or the other, but not amounting to a ground of principal challenge.

All challenges to the polls, either principal or to the favor, may be made *ore tenus*, but must be distinctly or specifically made before they are tried, so that the court can see what is the legal character of the challenge, and determine by what forum it is to be tried.

I have said that it is a ground of principal challenge *that a juror has declared his opinion of the case beforehand.* In order to support such a challenge, it must appear that the opinion expressed was out of ill-will or malice towards the party. The leading *authority* on this subject in modern times is Sergeant Hawkins, who, in his *Treatise on Pleas of the Crown* (*b.* 2, *c.* 43, § 28), says: "It hath been allowed a good cause of challenge, on the part of the ·prisoner, that the juror hath declared his opinion beforehand that the party is guilty, or will be hanged, or the like. Yet it has been adjudged that if it shall appear that the juror made such declaration from his knowledge of the cause, and not out of any ill-will to the party, it is no cause of challenge;" and for these positions the learned writer cites a large number of cases which show beyond doubt such is the law.

It has been supposed that an opinion of guilt founded upon newspaper reports, or other information, or personal knowledge, disqualifies a man from being a juror. But this is not so. It has been solemnly decided by our own Supreme Court in *Mann* v. *Glover,* 2 *Green,* 195, (*a*) that a hypothetical opinion founded on the supposition that the facts detailed are true, is no cause of challenge. And I have no hesitation in saying that a bystander who witnesses a homicide, or any other breach of the peace, is a perfectly competent juror, as much so as a witness to a bond or other contract between private parties would be on a trial concerning such bond or contracts. It is a common occur-

---

*Note* (*a*). In the case of *The People* v. *William Freeman* (indicted for the murder of the Van Neste family), the Supreme Court of the State of New York, in their opinion delivered at November Term, 1846, by Justice Beardsly on granting a new trial, refer with approbation to the doctrine on the law of challenge held in *Mann* v. *Glover,* and adopt it as the basis of their decision in that case in preference to the latitudinarian doctrines on that subject which had gradually been adopted in their own courts by repeated decisions.

rence, both in civil and criminal causes, to see jurors on the panel called as witnesses to prove some material facts in their knowledge relating to the matter in question.

A declaration of opinion to disqualify a juror, therefore, must be such an one as implies malice or ill-will against the prisoner, thereby showing that the person challenged does not stand indifferent between the State and him. This is the uniform language of the books and cases which are of authority under our constitution, as well as of the English courts up to the present time.

As to the mode of *proving* a challenge, the law of evidence is the same as in other cases. Proof may be made by records, papers, or witnesses, either to support the challenge, or to disprove it. The juror himself may be examined as to his statutory qualifications, or to any other matter not going to his dishonor or discredit.

But it has been repeatedly decided that it does go to his discredit to ask him if he has formed or expressed an opinion on the matter in issue, or that the prisoner is guilty. For, as this is no ground of challenge unless expressed in such a manner as to evince malice or ill-will towards the prisoner, it would be great injustice to the juror, and a legal impropriety which the court should not tolerate, to compel him, by his own testimony, to convict himself of what the law deems disreputable conduct. (4 *B. & A.* 471.)

I know that this practice has been suffered on former occasions, by my brethren on the bench, as well as by myself; but it was an unauthorized departure from the rules of the common law, and yielded to under the pressure of high judicial examples in other States. It is a practice productive of delay, vexation, and expense; and if continued, would involve us in the same embarrassments in the administration of justice, that have been witnessed in some of our neighboring States.

If the course which I shall deem it my duty to pursue on this subject, shall, in the result of this trial, be supposed to have prejudiced the rights of this prisoner, an opportunity will be afforded of referring the question to the adjudication of the Supreme Court. For myself, I am desirous of leaving my testi-

mony on record of what I believe to be the law of New Jersey in relation to this matter; and of doing what in me lies to bring back our criminal practice in this particular to the safe and tried rules of the common law.

After the evidence and summing up of counsel had been closed, the charge of the court was delivered to the jury by the Presiding Judge, who after stating the evidence of the fact, and defining the crime of Murder and its different degrees as distinguished by the Statute law of New Jersey, on the subject of insanity and the proof of it, charged as follows:

I now come to that part of the cause which constitutes the main ground of defence in this case, namely, Insanity. This question, in the nature of things, is the first one for you to consider. For it is of no consequence what circumstances attended the homicide, or in what manner the crime is varied in the eye of the law by those circumstances, if the prisoner was insane at the time of committing the deed. If he was insane, he is not amenable to the law at all for what he did. A person who is out of his mind, and does not know at the time that what he is doing is wrong, is not accountable for the acts committed by him while in that state. If he commit a homicide in that state, it is not necessary to look into the law of homicide at all, to ascertain the distinctions which the law makes between different homicides; for such a person is not under the law—he is not amenable to it. The law is all to be set out of the question as to him. He is, in one sense, an outlaw, or rather, he is out of the law, and ought to be secluded from society, in order that those who are under the protection of the law, may not be injured by him.

Was, then, the prisoner at the bar insane at the time of committing the homicide?

It is difficult to define in set terms, what insanity is. We all have a notion of what it is, and there is a great variety of phrases by which we are used to designate it. We say of a man who is insane, and has committed some atrocious act while in that state, "he was out of his head," "he had *not his senses* at the time," "his mind was disordered," "he was crazy when he did it," "he did not know at the time what he was about,"

and other language of similar import.   The simple question for you to decide, gentlemen, is " *whether the accused at the time of doing the act was conscious that it was an act which he ought not to do ?*"   If he was conscious of this, he cannot be excused on the score of insanity—he is then amenable to the law—and in that case, if such is your opinion from the evidence of the case, you will have to go on to the consideration of the circumstances attending the act, in order to distinguish to what kind of homicide it belongs according to the law of the land.

But if it is your opinion that at the time of committing the act he was unconscious that he ought not to do it, or in other words, incapable of distinguishing right from wrong, *in a moral point of view*, then you have nothing further to do, but to render a verdict of acquittal on the score of insanity.

And here I am not sure but I might safely leave this branch of the subject in your hands without further comment, for I fear that further remark might tend rather to confuse, than to assist you.   But probably counsel on both sides expect, and public justice may require, that I should lay down to you what the law is as to what amounts to proof of insanity, and as to the degree of weight which different kinds of proof should have.

I will remark, then, in the first place, that the law presumes a man sane until the contrary is proved.   Hence it has been repeatedly decided that the evidence of the prisoner's insanity at the time of the act ought to be clear and satisfactory.   If the evidence leaves it only a doubtful question, the presumption of the law turns the scale in favor of the sanity of the prisoner. In such case the law holds the prisoner responsible for his actions.

If it were doubtful whether the prisoner *committed the act*, then the jury ought to find in his favor ; for where the jury find a reasonable ground for doubt whether the accused *committed* the homicide, they ought to acquit.   *There*, the presumption of law is in favor of the innocence of the party ; every man is presumed to be innocent until he is proved guilty.

But where it is admitted, or clearly proved, that he committed the act, but it is insisted that he was insane at the time ; and the evidence leaves the question of insanity in *doubt ;* there the jury ought to find against him.   For there, the other presump-

tion arises, namely, that every man is presumed sane until the contrary is clearly proved.

I do not mean to say the jury are to consider him sane, if there is the least shadow of doubt on the subject, any more than I would say they must acquit a man when there is the least shadow of doubt of his having committed the act. What I mean is, that when the evidence of sanity on the one side, and of insanity on the other, leaves the scale in equal balance, or so nearly poised that the jury have a reasonable doubt of his insanity, there a man is to be considered sane and responsible for what he does. But if the probability of his being insane at the time is, from the evidence in the case, *very strong*, and there is but a *slight* doubt of it—then the jury would have a right, and ought to say, that the evidence of his insanity *was clear. The proof of insanity at the time of committing the act, ought to be as clear and satisfactory, in order to acquit him on the ground of insanity, as the proof of committing the act ought to be, in order to find a sane man guilty.*

In the 2d place, proof that a man has at some former period of his life been afflicted with such insanity as would render him an unaccountable being, and exonerate him from punishment, is not sufficient, if it also be proven, or comes out in the evidence that he has at any time since been so far restored to his right mind as to be capable of moral action and of discerning between right and wrong. Otherwise, a man who had once been out of his right mind, might ever afterwards commit any crimes he chose without being held responsible for it. If it were true that insanity never left a man after once clouding his mind, then it would be enough to exculpate him to prove that he had once been insane. But it often occurs that men have turns or "spells" of insanity, and then enjoy intervals of entire soundness of mind. Now although they would be excusable for what they did in a paroxysm of madness, they are by no means excusable for what they do when they have their senses. The question for you to determine is, not whether the prisoner was ever insane in the former part of his life; but whether he was insane at the time he committed the deed, for which he is now on trial. His having been insane once, or several times before, may render it more probable that he was in-

State v. Spencer.

sane at the time of the homicide, if there is any *direct* proof that he was insane at that time. But standing by itself it proves nothing where the State shows a subsequent return to reason. Evidence of former attacks of insanity amounts to about this: It does not show that the prisoner *was* insane at the time of the homicide; but if there is *any* independent evidence *that he was so* the former insanity increases the probability. The same remarks may be made with regard to the evidence of insanity in his family. Standing alone it amounts to nothing. It is *no* evidence that the prisoner was insane at the time of the homicide. But, if there is some independent evidence that he *was* insane at the time of the homicide, it increases the probability that he *may* have been. But standing alone, it is the weakest kind of evidence, and but little consideration ought to be given to it. It is undoubtedly true that some families are more subject to insanity than others. But that is no reason why the sane members of the family should be free from responsibility for their own misdeeds. Nor is it any very strong evidence that all the members of the family are tainted with the like disorder. I should feel hurt to suppose that my neighbors entertained a suspicion that *my* mind was disordered, merely because I had an unfortunate father or brother who was subject to turns of insanity. So feeble indeed is the influence which testimony of this kind ought to have, that many respectable jurists decide against its admissibility at all. But at all events, it can only have the effect of adding to the possibility that the prisoner *may* have *been* insane, when he committed the homicide; standing alone, it is no proof whatever that he *was*. I again repeat what you are always to bear in mind, that this ground of defence which we have been considering can be of no avail to the prisoner, unless from the evidence you are convinced beyond a reasonable doubt that the prisoner was *insane at the time of the homicide.*

In the third place, as to the *degree* of insanity under which the prisoner must be proved to have been laboring at the time of the homicide, in order to his exculpation. If you are satisfied beyond a reasonable doubt that he *was* insane, the next question for you to consider will be, whether his insanity was

*such* as to render him *incapable* of committing crime. For there are many kinds of insanity, and there are all degrees of insanity; and it is not every kind, nor every degree that will render a man irresponsible for acts of atrocity. Almost all the books declare that "*in criminal cases* in order to absolve the party from guilt, a higher degree of insanity must be shown, than would be sufficient to discharge him from the obligations of his contracts." (2 *Greenleaf on Evid., p.* 296.) "In cases of atrocity, the relation between the disease and the act should be apparent."—(*Ld. Erskine in Hadfield's case,* 1800; *Cooper's Tracts on Med. Juris., p.* 318.) As I said before, if the prisoner at the time of committing the act *was conscious that he ought not to do it,* the law holds him responsible, and he cannot be exculpated on the ground of insanity, although on some subjects he may have been insane at the time. There is many a man whose mind is not right on some subjects, who is nevertheless perfectly himself on all other subjects, and who knows as well as you or I what is right and wrong; and whether or not he would be doing right or wrong in lifting up a murderous hand against his neighbor. Several men of this kind have come under my own observation. One man will think himself made of glass, another will imagine himself to be a monarch or a prophet, or one of the heroes of history—another will be wild in some of his religious views; and yet each and all will know perfectly well that it would be wrong to kill a man out of revenge or provocation. *Whatever the insanity of a person* may amount to, if he is conscious at the time of committing an atrocious act, and has *reason* enough to know that he ought not to do it, he is guilty in the eye of the law. This was so expressly decided by all the judges of England, except one, in a late case in that country. (*McNaughten's case.* 2 *Greenlf. Evid.* 301. *Note.*) The question was put to them "What is the law respecting alleged crimes committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons, as, for instance, where at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or avenging some sup-

State v. Spencer.

posed grievance or injury, or of producing some supposed public benefit?" To this question the Judges answered as follows :— " Assuming that the question is confined to those persons who labor under such partial delusion only, *and are not in other respects insane*, we are of opinion that notwithstanding the party accused did the act complained of with a view, under the influence of insane delusion, of redressing or avenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law." In the same case, the judges also expressed themselves of opinion that where a man commits an act, criminal in its nature, who labors under any particular delusion, as that every dog he sees in the street is mad, or any other particular delusion, his act as to criminality is to be judged of as if the thing he imagines to be true were really so. If a man is under the delusion that I am going to take his life, he would be exculpated in taking my life. But if he acted only under the delusion that I was going to carry off his property, or pick his pocket, he would not be exculpated for taking my life, for those facts, if true, would be no justification of his act, unless he was also under the *insane delusion* that he had a right to take my life for such an act. So you see, gentlemen, that although a man be *partially* insane, the law does not exculpate him any further than the extent of his insanity. And the whole matter may be summed up in this : If the evidence makes it clear to your minds, beyond a reasonable doubt, that the prisoner at the time of the act, was unconscious that he ought not to do it, he is to be acquitted ; but if not, then he cannot be acquitted on the ground of insanity, *whether he was partially insane or not.*

It may be thought by some persons that this is a hard law, from the possibility that some, who ought not to be held accountable for what they do, may be involved in the punishment due only to sane and conscious criminals. But such persons should reflect on the object of punishment. The object of legal punishment is principally to prevent crime and preserve the

peace of society. This is to be effected so far as possible without injustice to any. But human laws are imperfect—human knowledge is imperfect; and if the law is to be administered upon such rules only as would render it an *impossibility* that any one should be improperly condemned, or that error or injustice should ever be done, then the administration of justice would be so impracticable, that our courts both civil and criminal, might as well be closed. Criminals would constantly escape merited punishment, and the injured parties, or the friends of the murdered, seeing the inefficiency of the law, would take the law into their own hands. This state of things has been exemplified to a considerable degree already in our own country, and I pray I may never see the day when it shall be exemplified in this State. We must administer the laws with firmness, however much we may in our hearts pity the culprit : and we are bound to be jealous of those defences, which call for the exculpation of the offender, *where the criminal act is clearly proved upon him.* Otherwise, we shall have no security for our lives, or the lives of our families. These considerations lie at the foundation of the law of insanity as I have expounded it to you, gentlemen, in relation to excusing a man from the consequences of his own atrocious acts. The law is *stringent* and *suspicious,* and it has to be so. If it were not so, we should be overrun with crimes and atrocities committed under the plea of insanity, or of some insane delusion. This is all that is meant when it is said that *insanity* is a defence not favored in the law. It is not intended, and GOD and humanity forbid it ever should be, that courts should frown upon insanity as a defence, or that if a jury are satisfied beyond a reasonable doubt, that the act complained of was committed when the accused was insane, they should for one moment hesitate in pronouncing a verdict of acquittal—but it is intended that they should see to it, that the defence is fully sustained by the evidence.

As germain to these remarks, it is also my duty to remind you, gentlemen, that outbursts of ungovernable passion do not excuse a man for any acts of atrocity he may commit under their influence ; on the contrary, they rather aggravate his guilt. Men are bound to control their passions ; and if they suffer them to

run away with their reason and senses, they ought to suffer for it. One of the very objects of having laws to govern us, is to protect us from the fury of ungovernable passion—whether that be anger, hate, envy, jealousy, or any other of the malignant passions, a man is equally culpable for suffering himself to be goaded on by any of them to the commission of crimes at which humanity shudders. There are cases, it is true, where long and frequent indulgence in violent passions has destroyed the balance of the mental powers, completely dethroned the reason, and terminated in confirmed insanity. Then, of course, the man is no longer accountable. He is then only fit for the asylum or the madhouse.

Fourthly. Having enlarged thus much on this difficult subject, it seems proper that I should add a few observations on the *nature and weight of the evidence* which is usually adduced to prove insanity. I may begin by saying that the act charged against the criminals, in itself, no proof of insanity. The man who commits a heinous offence against God and man, is undoubtedly very *unwise.* The Sacred Volume calls him a *Fool :* and, in one sense, he is a madman. He madly gives way to the instigations of the evil one, or of his own evil heart. But this is not the kind of madness that is to excuse a man from the punishment due to his crimes. If it were, there would be no such thing as crime. Every act of crime would only be proof of the insanity of the perpetrator; and the greater the crime, the stronger the proof. When people say that a man must have been crazy to have committed such an act, they must be understood as speaking figuratively. It is too unhappily true that man, conscious, sensible, reasoning man, is often found prostituting his nature so low, as to be guilty of crimes of the deepest dye.

I cannot yield to the doctrine which has been suggested, founded upon what is called moral insanity. Every man, however learned and intellectual, who, regardless of the laws of God and man, is guilty of murder, or other high and disgraceful crimes, is most emphatically morally insane. Such doctrine would inevitably lead to the most pernicious consequences, and it would very soon come to be a question for the jury, whether

the enormity of the act was not, in itself, sufficient evidence of moral insanity ; and then, the more horrible the act, the greater would be the evidence of such insanity. On the contrary, in my judgment, the true question to be put to the jury is, whether the prisoner was *insane* at the time of committing the act: and in answer to that question, there is little danger of a jury's giving a negative answer, and convicting a prisoner, who is proved to be insane on the subject matter relating to, or connected with the criminal act, or proved to be *so far* and *so generally* deranged as to render it difficult, or almost impossible, to discriminate between his sane or his insane acts. I mean no disrespect to the learned writers on medical jurisprudence, or other distinguished men of the medical profession. On the contrary, I consider the administrators of criminal law greatly indebted to them for the results of their valuable experience, and professional discussions on the subject of insanity ; and I believe those judges who carefully study the medical writers and pay the most respectful but discriminating attention to their scientific researches on the subject, will seldom, if ever, submit a case to a jury in such a way as to hazard the conviction of a deranged man.

These remarks, and all I have said, calculated to caution you against confounding mere outbreaks of passion, or mere acts of depravity, with that sort of insanity which excuses from punishment, you are not to regard as the expression of an opinion on the part of the Court, that the act of homicide committed by the prisoner was an act of criminal passion or revenge, or that it was an act of insanity. This is the very question you are to decide, and which it is my desire to submit to your decision uninfluenced by any opinion of mine.

The evidence of insanity upon which a jury should rest, will vary with every case ; but generally speaking, the evidence of those who saw the person accused every day immediately previous to the commission of the act, who were intimate with him, talked with him, ate and drank with him, and who testify to his acts, his words, his conversation, his looks, his whole deportment, is that on which a jury ought to place the greatest reliance. The evidence of competent medical men, who have had

frequent opportunities of observing him about the time in question, especially if they have been in attendance upon, or have visited him with a view to probe the state of his mind, is entitled to very great consideration. It has always been held that medical men may give their opinions in evidence. These are always valuable, and more or less so according to their opportunities of observing the accused at, or about the time of the act complained of. But if they have not been in the habit of seeing him, if they were not familiar with his habits and symptoms, at or about the time in question, their opinions in relation to a particular individual, are of no more weight, and in my judgment of not so much weight, as those of unprofessional persons of good sense, who have had ample opportunities for observation.

One strong circumstance generally attending the commission of acts of violence by persons who are *really* insane is, the absence of any apparent *motive*. It is not unfrequently their best friends, those who are most kind and attentive to them, who are the victims of their unconscious and destructive violence. I do not say that this absence of apparent motive *invariably* exists in cases of homicide and other atrocious acts committed by insane persons; but I say that it is *generally* the case. Hence, if we witness the perpetration of such an act without any apparent motive or object, but against every motive which would appear to be naturally influential with the person committing it, we are at once awake to the inquiry whether he was in his sound mind, and if we can lay hold of any sufficient evidence that he was not so, this absence of apparent motive, confirms us in the belief that he was insane.

But where the evidence of the case shows that there were strong motives of anger, jealousy, or hate, to actuate the accused, such motives as might naturally induce a man of depraved and wicked heart, and violent, ungovernable passions, to perpetrate the crime of which he stands accused, we cease to look for other causes of the deed committed, and naturally attribute it to those which so glaringly present themselves. We at once, unless the evidence of his being actually insane is forced upon us, attribute it to his own wicked nature and the unholy indulgence of his ungovernable passions. This process

of our minds is natural, and is founded in the truth and reason of things. You ought to inquire, therefore, gentlemen, whether in the case before you, the prisoner at the bar committed the act charged upon him as a crime, in the absence of any such motive as would naturally inflame the mind of a depraved man to the commission of acts of violence. If no such motive existed, that circumstance will add great strength to the proof of his insanity; but if, on the other hand he was assailed by strong motives of revenge, or other passions, you have a right to infer that it was under the influence of those motives that he committed the deed, and not under the influence of insanity, unless the proof of actual insanity at the time is clear and convincing to your minds.

I will take notice of one more consideration which it is proper for the jury to regard in making up their verdict in this case. It is this. It is undoubted law, that when a man is proved to have been once insane, the presumption is, that he continues so until the contrary is shown. If I have left a relative in England who was then afflicted with insanity, and I have not since heard from him, the presumption is that he is still insane. True, he may have recovered; and since the humane methods with which the disease is now treated, have become general in civilized countries, the probability of recovery from mental derangements is greatly increased. Still, the presumption of law remains the same. The presumption is that my afflicted relative is in the same condition he was when I left him. But if I learn that he has recovered, or that he has sane intervals, and is sufficiently restored to attend to his business, then the aspect of things is changed. There is no longer any presumption that he is still insane. So, in the case in hand, if the prisoner has proven that he was once insane, the presumption arises that he is still insane at this moment, unless the contrary be shewn. The evidence on this subject is all before you, gentlemen, and the prisoner is himself before you, and if you have no evidence of lucid intervals since the time of the insanity proved, you must of course find him still insane, and insane at the time of committing the act in question. But if the prosecution has succeeded in showing that since the period of insanity (if any) proved

by the prisoner, he has been himself conscious of right and wrong, and every way a responsible man, the presumption of insanity is done away.

This, gentlemen, is all that I deem it my duty to say to you on the question of insanity, as a defence. In doing this, it has been my object and design to give you, *in the abstract and without reference* to the evidence and the circumstances of this particular case, the law upon the subject of insanity when set up as a defence, both as respects the extent and character of that sort or degree of insanity which is required to constitute a defence, and of the evidence by which it may be established. And I hope I may not be understood by you as having, by anything I have said, in the slightest degree indicated any opinion that the prisoner has failed to establish such insanity, at the time of committing the homicide, as ought upon the soundest rules of law, and in accordance with the dictates of our common humanity, to exempt him from the penalty due to crime, when committed by rational and accountable beings; nor on the other hand is it my intention to express any opinion that the defence has been sustained. The question of the prisoner's sanity or insanity at the time of committing the act charged, is appropriately and exclusively within the province of the jury. It will be sufficient for the court to call the attention of the jury to such evidence on the part of the prisoner as lays any foundation for a belief that he was insane at the time of the homicide. I have said that insanity is not to be inferred, but to be proved. By this, however, I did not mean that such acts and conduct as establish insanity can only be proved by witnesses who saw him at, or about the time of the commission of the fatal deed. On the contrary, the jury may be convinced that he was then insane, and unconscious of doing wrong, from evidence of prior insanity, or strong symptoms of insanity, or of an evident predisposition to it; or from proof of a peculiar temperament of mind, and of nervous excitability in the early and continued history of his life, or in his former partial aberrations of mind upon certain topics, such as temperance, politics, or mesmerism ; *if they are satisfied* that the unhappy circumstances in which he was placed in regard to his wife, the grounds he had for believ-

ing her unfaithful, and the cruel treatment he received, or believed he received, from her mother and brother, and the attempt to drive him from her that Richardson, or some one else might occupy his place, had produced such an effect on his already shattered intellect, as to dethrone the little remains of reason he possessed, and leave him unconscious of the wickedness of the act he was perpetrating. And this will present to you the true question in the case which, in the language of Lord Chief Justice Denman, in the case of Oxford (9 *Carr, & Payne* 221), is " whether the evidence given proves a disease in the mind, as of a person quite incapable of distinguishing right from wrong :—Whether the prisoner was laboring under that species of insanity which satisfies you that he was quite unaware of the nature, character, and consequences of the act he was committing : or, in other words, whether he was under the influence of· a diseased mind, and was really unconscious, at the time he was· committing the act, that it was a crime."

The *expressions* of the deceased are irrelevant to the issue in this cause. If she were a party to the suit ; if she were the accuser of this man, and it was a matter entirely between themselves, then *her* expressions—the words she may have uttered—would be admissible against her. But on this issue, between the State of New Jersey, and the prisoner at the bar, what she has said or admitted should have no more weight than what any other person may have said. It has been testified that she declared the prisoner insane. This is no proof that he was so. She may have said this for the sake of her own character and credit ; or she may have said it from other interested motives. *What she said* is not to be the rule to guide us here. Nothing but the proof of what the *fact was,* can or ought to have any weight with the jury.

The evidence is before you, and it is your peculiar province to judge of its weight and the results to which it leads. If, in your opinion, it is clearly proved that the prisoner at the bar, at the time of the homicide, was unconscious that what he did was wrong, and that he ought not to do it, you must acquit him on the ground of insanity ; but if in your opinion this is not clearly established beyond a reasonable doubt, then you must find

State v. Spencer.

him guilty of the act, and proceed to investigate the nature of the homicide.

In view of my accountability to Him, before whom judges must be judged, who knoweth the secrets of all hearts, and who cannot be deceived, I have most conscientiously declared to you the law, upon the subject of Insanity, when set up as an excuse for acts which, if committed by sane persons, would subject them to severe, or capital punishment. I doubt not, gentlemen, the same high and holy motives will influence your decision; the same anxious desire to redeem the solemn pledges you have given, will agitate your bosoms, while you are making up your verdict.

CITED *in State* v. *Fox,* 1 *Dutch.* 586-593-599; *Donnelly* v. *State,* 2 *Dutch.* 509-616.