58 N.J. Super. 472 (1959)
156 A.2d 714
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHARLES SCELFO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 1959.
Decided December 14, 1959.
*474 Before Judges PRICE, SULLIVAN and FOLEY.
Mr. Nicholas Martini argued the cause for defendant-appellant.
*475 Mr. Archibald Kreiger, Legal Assistant to Prosecutor, argued the cause for plaintiff-respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendant appeals from a conviction of the crime of bookmaking (N.J.S. 2A:112-3) entered in the Passaic County Court on a jury verdict.
The sole defense to the indictment was that defendant was legally insane at the time of the commission of the acts alleged therein. On this appeal it is urged (1) that the evidence of defendant's insanity having been uncontradicted medically, the trial court erroneously denied defendant's motion for a judgment of acquittal; (2) that for the same reason the conviction was against the weight of evidence; (3) that the court in its charge should have burdened the State with proving defendant's sanity beyond a reasonable doubt; (4) that hospital records relating to defendant's prior mental condition should have been admitted in evidence.
The proof adduced by the State was uncontradicted: on February 1, 1958, a squadron of detectives from the office of the Prosecutor of Passaic County raided the premises of the Second Ward Veteran's Club in the City of Passaic. Upon entering they found the defendant and a number of other persons, later identified as club members and bettors, sitting at a table. In front of Scelfo were schedules of college and professional basketball games played or to be played during the previous and current weeks. The detectives searched defendant immediately and found in his coat pocket nine slips which he admitted were records in his own handwriting of wagers on basketball games he had accepted. He had in his pockets the sum of $519.89, $423 of which he admitted was the product of his bookmaking activities.
Scelfo remained calm throughout the raid, frankly admitted that he was the bookmaker, and asserted that the other men present were not in any way involved in the gambling operation. He was placed under arrest and taken *476 to police headquarters where he was formally interrogated by the officers. He answered calmly, accurately, and responsively. After his voluntary account was typed he read it and approved its accuracy, but refused to sign it because of advice previously given to him by a lawyer. The statement was offered in evidence. It is in question and answer form and covers in such detail the identification and explanation of the betting records which were seized as to impel the conclusion that he was completely aware of the nature of his difficulties.
Additionally, three witnesses, who testified for the State that they had placed bets on basketball games with the defendant during the month of January 1958, said that he handled the transactions in a normal manner and experienced no difficulty in computation. Parenthetically we observe that certain of the bets known as "parlay," "round-house," and "round robin" appear to have been relatively involved.
The lay testimony of insanity may be summarized as follows: Scelfo, 42 years of age at the time of the trial, served in the Armed Forces during World War II and was separated from service in 1945. He then took up residence with his two sisters, who live next door to each other in Passaic. Both testified that shortly after his return from service he appeared to be nervous, argumentative, careless of his dress and person, and unkempt. As time went on he developed eccentricities of an objectionable nature such as using toilet facilities without closing the bathroom door; he frequently complained of headaches and often said that he thought "someone was chasing him."
In October 1955 he was taken by his sisters to the New Jersey State Hospital at Greystone Park where he was examined by Dr. Lawrence M. Collins, a well-known psychiatrist. Dr. Collins recommended that he be committed to the hospital, and on January 10, 1956 he entered as a voluntary patient. The medical proofs established that he remained at the hospital until June 13, 1956, when he was discharged in "convalescent care." During his confinement *477 he received insulin injections, shock treatment and related therapy. His mental illness was diagnosed by the hospital staff as "schizophrenic reaction, chronic undifferentiated type," a condition which is also known as dementia praecox. He was finally discharged from the institution on June 13, 1957. In December of that year he again visited Dr. Collins for treatment. At that time tranquillizers were prescribed and he was sent home. In January 1958 he again complained of illness and sought Dr. Collins' assistance. The doctor then suggested that he have himself admitted to the hospital for treatment, but Scelfo declined to do so. On May 24, 1958, which was subsequent to his arrest, he was admitted as a voluntary patient but left again on June 13, 1958. Between then and the time of trial he was seen by Dr. Collins on four occasions. Each time he was found to be in good mental health. In response to a question by the court the doctor stated that the defendant was sane at the time of trial.
The entire factual complex was presented to Doctors Collins and Zigarelli in hypothetical questions, in response to which both testified unequivocally that during the month of January 1958 Scelfo was unaware of the nature and quality of his acts and did not understand the difference between right and wrong. Thus the opinions were in accord with the M'Naghten rule recently reaffirmed as the law of this State in State v. Lucas, 30 N.J. 37, 72 (1959).
Defendant urges that the uncontradicted opinions of these highly qualified medical experts were completely dispositive of the insanity issue and required the court to enter a "judgment of acquittal by reason of insanity." The underlying theory of this contention is that the medical testimony completely destroyed the recognized presumption of sanity. We cannot agree. It is well settled, of course, that expert testimony bearing upon the sanity of the accused is relevant and admissible. However, as with all evidence, such testimony is subject to the test of credibility in light of the attendant facts. Also it is in parity with lay opinion *478 testimony in that the jury is entitled to give to each equal weight. Tyler v. Tyler, 401 Ill. 435, 82 N.E.2d 346 (Sup. Ct. 1948) (involving capacity of testator at time of execution of will). Nonetheless, expert testimony has a strong bearing on the proceeding and must not be arbitrarily disregarded. Cullers v. Commissioner, 237 F.2d 611 (8 Cir. 1956); cf. Fielding v. United States, 102 U.S. App. D.C. 167, 251 F.2d 878 (1957). But in the face of conflicting evidence the issue is within the exclusive province of the jury. State v. Spencer, 21 N.J.L. 196, 211 (O. & T. 1846). See also People v. Cole, 47 Cal.2d 99, 301 P.2d 854, 56 A.L.R.2d 1435 (Sup. Ct. 1956); People v. Williams, 151 Cal. App.2d 173, 311 P.2d 117 (Dist. Ct. App. 1957). Cf. Smith v. Holloway, 262 Ala. 273, 78 So.2d 318 (Sup. Ct. 1955) (action to set aside deed of an allegedly insane grantor). The reason for this rule is two-fold: (1) the right to a jury trial requires that the jury be the ultimate determinative body, thus making incompatible any concept of binding expert opinion testimony; and (2) as indicated, medical evidence is subject to the traditional tests of credibility, including its basis in fact. See, e.g., State v. Wesler, 137 N.J.L. 311 (Sup. Ct. 1948), affirmed 1 N.J. 58 (1948) (where the court refused to find error because the only evidence for the prosecution was presented by witnesses termed unreliable by the medical expert because of their psychopathic personalities). In that case it was said:
"Jurors are not bound to believe testimony of any witness in whole or in part, but they may reject what in their conscientious judgment ought to be rejected and accept that which they believe credible." Id., 137 N.J.L., at page 314.
Accord, State Board of Medical Examiners of New Jersey v. Plager, 118 N.J.L. 434 (Sup. Ct. 1937). Cf. Panke v. Grimes, 40 N.J. Super. 588 (App. Div. 1956).
In determining mental capacity the jury is entitled to consider the conduct of the accused as it appeared to lay *479 observers at the time of the crime. See, e.g., People v. Williams, supra (where the court stressed the coherent character of statements in a confession in face of expert testimony of insanity); United States v. Fielding, 148 F. Supp. 46 (D.C.D.C.), reversed 102 U.S. App. D.C. 167, 251 F.2d 878 (1957), as being contrary to the weight of the evidence. In that case the court stressed the importance of the activities of the accused immediately prior to the crime and said:
"Obviously the opinions of psychiatrists constitute evidence to be considered and weighed by the jury, together with other evidence, but are not binding on it. Otherwise, a trial by experts would be substituted for a trial by jury. That the testimony of psychiatrists does not preclude the jury from reaching a contrary verdict on other evidence in the case was ably and emphatically demonstrated by Judge Arnold in Holloway v. United States, 80 U.S. App. D.C. 3, 5, 148 F.2d 665, 667, where he made the following statement:
`A complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are different. For that reason the principal function of a psychiatrist who testifies on the mental state of an abnormal offender is to inform the jury of the character of his mental disease. The psychiatrist's moral judgment reached on the basis of his observations is relevant. But it cannot bind the jury except within broad limits.'
Judge Arnold also indicated that great weight must be attached to evidence indicating that a defendant talked rationally at the time of the commission of the offense or shortly thereafter." 148 F. Supp., at page 55.
Cf. Boaz v. Mutual Life Ins. Co., 53 F. Supp. 97 (D.C.E.D. Mo. 1943) (emphasizing the precision with which decedent had acted in preparation for his suicide to sustain finding of sanity). See also People ex rel. Vallero v. Travis, 72 N.Y.S.2d 804 (Sup. Ct. 1947) (holding that conduct of accused controlled over medical testimony that defendant was incapable of standing trial).
A fair consideration of the demands on defendant's mental integrity which were implicit in the gambling scheme, *480 and the evidence of the normality of his conduct during its operation and at the time of his arrest, convince us that the collision between the inferences of sanity arising therefrom, and the medical testimony vouching insanity, created a factual issue which was properly submitted to the jury.
Moreover, we are satisfied that the finding of defendant's sanity at the time of the commission of the crime, which inheres in the verdict of guilty, cannot be said to have been contrary to the weight of the evidence.
As stated above, defendant argues that because his prior condition of insanity was proved, the court was bound to charge that there was a presumption of the continuance of such aberration which deprived the State of the benefit of the presumption of sanity and called upon it to prove beyond a reasonable doubt that defendant was sane. This does not accord with the law. Defendant lays stress on State v. Spencer, supra, as authority in support of this branch of the appeal. The case refutes the stated proposition. There the court in charging the jury properly defined the law as follows:
"The question for you to determine is, not whether the prisoner was ever insane in the former part of his life; but whether he was insane at the time he committed the deed, for which he is now on trial. His having been insane once, or several times before, may render it more probable that he was insane at the time of the homicide, if there is any direct proof that he was insane at that time. But standing by itself it proves nothing where the State shows a subsequent return to reason. Evidence of former attacks of insanity amounts to about this: It does not show that the prisoner was insane at the time of the homicide; but if there is any independent evidence that he was so the former insanity increases the probability." Id., 21 N.J.L., at p. 202.
It is well settled that it is upon defendant that the burdens of proof and of going forward with the evidence as to insanity devolve. State v. Cordasco, 2 N.J. 189 (1949); State v. Molnar, 133 N.J.L. 327 (E. & A. 1945); State v. Lynch, 130 N.J.L. 253 (E. & A. 1943); State v. Overton, 85 N.J.L. 287 (E. & A. 1913).
*481 As previously noted, defendant also claims error in the refusal of the court to admit in evidence the records of his two commitments to Greystone Park in support of the insanity defense. Generally such records are evidential under N.J.S. 2A:82-35 (Uniform Business Records as Evidence Act). See Gilligan v. International Paper Co., 24 N.J. 230 (1957). However, admissibility extends only to the portions of the record which are relevant to the issues involved in the case. Weis v. Weis, 147 Ohio 416, 430, 72 N.E.2d 245, 169 A.L.R. 668 (Sup. Ct. 1947); Gile v. Hudnutt, 279 Mich. 358, 272 N.W. 706 (Sup. Ct. 1937). See also Hale, "Hospital Records as Evidence," 14 So. Cal. L. Rev. 99 (1941). We agree with appellant that the records were not objectionable upon the ground of remoteness, since evidence of prior mental derangement at whatever time would have lent support to the claim of insanity as it was presented through the medical and lay testimony offered in defendant's behalf at the trial. See State v. Spencer, supra. Nevertheless, we are satisfied that the refusal to receive the charts in evidence was not error in the peculiar circumstances of the case.
The offer was made, not of portions of the records, but of them in their entirety. Our inspection of these exhibits discloses that in effect they merely memorialize facts which were testified by Doctors Collins and Zigarelli with scrupulous attention to detail. It was not the purpose of the statute to provide a means of adding weight to medical testimony by proving that a medical witness had at a previous time recorded the subject matter of his testimony. Rather, the objective was to enable a party to put before the court and jury evidence relevant to his claim, of the benefit of which he might otherwise be deprived for a variety of reasons. As was said in Weis v. Weis, supra:
"The purpose of Section 12102-23 General Code, [Uniform Business Records as Evidence Act] is to liberalize and broaden the shop book rule, recognized at common law as an exception to the general rule excluding hearsay evidence, * * * and, as applied *482 to hospital records [is] to avoid the necessity and thereby the expense, inconvenience and sometimes the impossibility of calling as witnesses the attendants, nurses and physicians who have collaborated to make the hospital record of a patient." 72 N.E.2d, at page 250.
See also New York Life Ins. Co. v. Taylor, 79 U.S. App. D.C. 66, 147 F.2d 297 (1944); 6 Wigmore on Evidence (3d ed. 1940), § 1707. We have carefully read defendant's brief and find lacking in its content reference to any matter bearing on his mental condition as disclosed by the records which was not vouched on the witness stand by the eminent medical experts who testified in his favor.
Moreover, the chart of admission to the hospital on January 10, 1956 contains a history sheet which reads in part as follows:
 "Number of Picture in Gallery 6830 Alias Biff
Criminal Record (As far as known) 5-24-51 Chg/ Gaming. Held for G.J. 5-16-52 Fined $1000 & probation to pay. Judge Hindcliff.
 (5-24-51  2nd Chg:) Gaming. (State Act)
May 16-52 Dismissed on 2nd charge. 4-1-52. Chg: Gaming; State Act $5000. Bail G.J. 2-5-53 Final, Disposition: Not Guilty. Judge MacLeod, this final applies to charge of 5-24-51 as per Davenport County B. of I. Paterson.
May 21-54: (2) Chgs: Bribery, Attempt. Cedar Grove Police Dept.
Jan. 13, 1955: Bookmaking: 2A-112-3 State Act. $5000. Bail G.J. Final Disposition:?
Feb. 25-55: Bookmaking: $1500.00 Bail G.J. Final Disposition?"
The defendant did not testify, and so the State was foreclosed from bringing his criminal record to the attention of the jury.
The difficulty which is always presented to both court and counsel, as they strive to confine jury consideration of a criminal record to the issue of defendant's credibility as distinguished from the ultimate issue of his guilt, is well known to both. Indeed, it has been the basis of the frequently projected argument that the statute permitting such proof (N.J.S. 2A:81-12) should either be modified or repealed. See Report of Committee on the Revision of the *483 Law of Evidence to the Supreme Court of New Jersey, pp. 42-44 (1955). The introduction of the record in this case would have been particularly damaging to defendant. Here the entire defense rested on the contention that defendant lacked the mental capacity to understand the nature and quality of his acts of bookmaking during the month of January 1958. The harmful effect on this defense which would have been engendered by a showing of a pattern of unlawful behavior  in some instances identical with that for which defendant was on trial and in all other instances intimately related to it  extending over a period of seven years, is incalculable. Consequently it plainly appears that the rejection of the records by the trial court actually worked to defendant's advantage rather than to his detriment.
Affirmed.