STATE OF NEW JERSEY, DEFENDANT IN ERROR, *v.*
HARRISON W. NOEL, PLAINTIFF IN ERROR.

*Argued February 2, 1926—Decided May 17, 1926.*

1. Where the record returned under a writ of error states that the defendant, "refusing to plead to said indictment * * * The court ordered a plea of not guilty to be entered" (2 *Comp. Stat., p.* 1839, § 58), the appellate court will not consider, in view of the state of the record, whether the defendant stood mute or refused to plead, as the record imports absolute verity, and if wrong must be corrected before the appellate court will consider the question.
2. An appellate court will not review the finding of a trial court to determine the sanity of a defendant prior to trial of an indictment if there be testimony to support the finding.
3. The adjudication that a person is insane is no bar to the prosecution of the insane person for a crime.
4. Where the defendant killed the driver of a taxicab to obtain possession of the taxicab for use in the kidnapping of a child, testimony as to the kidnapping of the child is relevant on the subject of motive.
5. Whether a confession is voluntary or not is a court question to be determined by the trial court. A finding that a confession is voluntary will not be reversed if there be evidence to support the trial court's finding, unless the question be considered from the aspect as to whether the defendant has suffered manifest wrong or injury.

6. If a defendant is convicted of murder in the first degree and the trial court properly defines murder in the first degree, the defendant is not prejudiced by an improper definition of murder in the second degree.

7. It is reversible error for a trial judge to make in his charge a misstatement with relation to a fact of moment, that is, that it was proved, when there was no testimony to support it.

8. The test of sanity as laid down in *State* v. *Spencer*, 21 *N. J. L.* 196, reaffirmed.

9. Weight of evidence reviewed and considered and verdict rendered *held* to be against the weight of the evidence.

On writ of error to the Essex Oyer and Terminer.

For the plaintiff in error, *William Wachenfeld* (*Merritt Lane*, of counsel).

For the defendant in error, *John O. Bigelow*.

The opinion of the court was delivered by

KATZENBACH, J.    The plaintiff in error, Harrison W. Noel (hereinafter referred to as the defendant, or Noel), was convicted in the Essex Oyer and Terminer of murder in the first degree without recommendation of life imprisonment. The indictment under which he was tried and convicted charged him with the murder of Raymond Pearce, on the 3d day of September, 1925. The trial judge had no alternative, in view of the verdict of the jury, except to sentence the defendant to death. This sentence was pronounced.

The writ of error directed to the Essex Oyer and Terminer brings up the record of the conviction. The questions presented to this court for its decision can be better understood and considered if a review is made of the crime for which the defendant was convicted, and a brief history of the life of the defendant prior to September 3d, 1925, is given.

Raymond Pearce was a chauffeur. He drove a taxicab, a Dodge touring car, license No. 9722. He was last seen alive at the railroad station in the town of Montclair, in Essex county, on Thursday, September 3d, at about one-thirty P. M. On Saturday, September 5th, at five P. M., Herbert H.

Matts was walking along the Little Falls road at Cedar Grove, in Essex county. When he arrived at the bridge over the Peckham river he looked through the brush at the side of the road. His eye was attracted to something white. He made an investigation. He found the dead body of a man, afterwards identified as Raymond Pearce. The white article which he had seen from the road was a shirt upon the body of Pearce. Pearce had been killed by a .32 calibre steel-jacketed bullet. This bullet had entered the lower back part of Pearce's head. The pistol from which it had been discharged had been held so close to the head of Pearce that the scalp showed a slight burn. A physician at eleven P. M. on the same day performed an autopsy. He was of the opinion that Pearce had been dead longer than fourteen hours and less than forty-eight hours, and, probably, in the neighborhood of twenty-four hours. On Saturday, September 5th, at eleven-twenty A. M., the taxicab driven by Pearce was found near Bradford avenue, Cedar Grove, in the woods. Near the place where the taxicab was found was a stone quarry. On Friday, September 4th, 1925, at about eleven-thirty A. M., the wife of the chief of police of Cedar Grove had noticed near the quarry a maroon Overland touring car, bearing the license number 156433 N. J. She told her husband what she had seen. This information was imparted to Fred Gallagher, a Montclair detective, who called up the license bureau at Trenton and received the information that the license number 156433 N. J. had been issued for a car belonging to the Noel family. Upon receiving this information the detective immediately went to the Noel home on North Mountain avenue, Montclair. He talked with the defendant and then took him to police headquarters. On Sunday, September 6th, Gallagher searched the room of Noel. He found upon the floor beggar lice, a variety of weed which grew in the woods near Bradford avenue, Cedar Grove. A box of .32 calibre steel-jacketed bullets and a receipt for a .32 calibre Spanish automatic pistol were also found in the room of Noel. The receipt showed that the pistol had been purchased on August 24th, 1925, at a sport-

ing goods store in New York City. The receipt was made to Wallace Payne, Falls road, Little Falls, New Jersey. The manager of the store where the pistol had been bought testified at the trial that the pistol had been bought and mailed to Wallace Payne at the address mentioned. The postmaster at Little Falls identified Noel as the one who had received a package eight inches long and five or six inches wide on August 25th, 1925. A Spanish automatic pistol was found under the back seat of the maroon Overland touring car. Stains were observed by Captain Mason, of the Essex county prosecutor's office, on the coat of Noel and on the leather cushion of the front seat of the Dodge taxicab of Pearce. Examination of these stains showed that they were spots of the blood of mammals.

On Friday, September 4th, 1925, at about noon, John Sandin, a chauffeur in the employ of Mr. J. A. Bower, residing at 136 Upper Mountain avenue, in the town of Montclair, was cleaning a Buick sedan car. A commotion took place in front of the premises. A Dodge touring car bearing the license 0722 N. J. was pointed out to Sandin. He followed the Dodge car, with the Buick car, for some eight or nine miles, and pulled the Buick car alongside of it. The defendant, Noel, was sitting in the driver's seat. Alongside of him was a little girl about six years of age, whose name Sandin afterwards learned was Mary Daly. The defendant stopped his car, reached for a pistol, obtained it, and shot Sandin in the head. Sandin recovered, but remembers nothing which occurred after he had been shot.

Detective Gallagher, as has been stated, first saw Noel at his home on Saturday, September 5th, at about five P. M. Noel was questioned regarding the whereabouts on Friday of the Overland car. He insisted that he had driven the car to Morristown, New Jersey, on that day. This was in contradiction of the reports that had been made to Gallagher. The defendant was then taken by Gallagher to police headquarters and questioned continuously until five A. M., on Sunday, September 6th. About three or four A. M. he admitted having taken the child, Mary Daly. He said that she

was alive and that he wanted $4,000 for her return. During the night he was besought by some five police officials, two physicians who had previously attended the defendant at the Overbook Hospital for the Insane, his mother, and the father of Mary Daly, to tell where the child might be found. The police offered to pay him $4,000 or more. Noel was also told he would not be returned to the Overbrook Hospital if he revealed the whereabouts of the little girl. Mr. Daly, the father of Mary Daly, told Noel that if he would tell him where his little girl was he would not prosecute him at all. At about five A. M., on Sunday, Noel said he would show them where Mary Daly was. He went in an automobile with several officers and directed that the car be driven from Montclair up through Little Falls, and then up a back road to a point where he directed the driver to stop. They all got out and Noel said, "There she is." The body of Mary Daly was discovered. She had been shot in the side of the head. The defendant was then brought back to police headquarters. He was then asked what he had done with Pearce. He said he had shot Pearce. He then went in an automobile with members of the police force and directed them to the place on Bradford avenue where he had shot Pearce. He was then asked what had become of the gun, and he said it was under the rear seat of his car. The Overland car was searched in the Noel garage and the pistol was found in the place Noel had designated. Upon his return to the Montclair police headquarters from the second automobile trip Noel was told by Captain Mason that he desired him to make a statement of everything he had done. Noel was then warned that such a statement would be used against him and he replied that that was all right. In answer to questions asked him by a detective, Thomas Diamond, a statement was prepared which was handed to the defendant. He read it and signed it about seven-thirty P. M., on Sunday, September 6th. The statement described the purchase of the revolver, the formation of an intention to kidnap a young girl who lived at 136 Upper Mountain avenue, in Montclair, for the purpose of obtaining money from her parents for her return, the details

of the killing of Pearce in order to obtain the use of his car, the seizing of Mary Daly in front of 136 Upper Mountain avenue, the pursuit of his car, the firing of the revolver at his pursuers, the killing of Mary Daly, the driving of the Dodge car to the woods near Bradford avenue, the obtaining of his Overland car, the driving to his home and putting on clean clothes, obtaining books at the library, going to a telephone booth, finding the name of Mr. J. A. Bower in the telephone directory as the person residing at No. 136 Upper Mountain avenue, telephoning to the house, asking a woman who answered the telephone if she was interested in a little girl that had been taken away that morning, and, upon receiving an affirmative answer, stating that he wanted $4,000 ransom for her return and telling her there were some banks open in the theatre district in upper New York City, a visit to New York on the following day, and the call of Mr. Gallagher upon him,· and his accompanying him to the police headquarters.

The following is a brief history of the defendant. He is twenty years of age. He was born in New York City and lived for fifteen years in the town of Montclair. His parents are living. He has a brother and a sister. His father was intemperate after his marriage to the defendant's mother. On his mother's side there exists a strain of insanity. A sister of his mother committed suicide at the age of twenty years. She suffered from melancholia. Two of the five children of his maternal grandparents were abnormal. The defendant attended school in Montclair. He seemed to have had no difficulties in his studies until his junior year in the high school. He then failed in all his examinations at the close of the school year. He studied during the summer and passed successfully the subjects in which he had failed. He completed his senior year. He passed the college board examination for Harvard. He made arrangements to go to Harvard and then suddenly conceived the notion that he must go to Andover. He went to Andover and remained there two days; he then went to Harvard and remained there until the Christmas vacation and then left. He re-

turned home and obtained a position in the stock exchange as a messenger. He retained this two weeks. He then said that he was going to study Latin and mathematics, and nothing else. He remained home between two and three weeks, during which time he secluded himself in his room, except at meals. He did not associate with his brother or other members of the family. He did not go out. He obtained a piece of black cheese cloth and built a coop about his desk and chair in the middle of his room on the third floor and stayed inside the coop for days at a time, apparently, studying. He then rented a cottage in an isolated section of the Ramapo valley, about five miles from the Oakland railroad station. He left his home one evening at nine P. M., when there was a heavy fall of snow, to go to this cottage. He would not heed the requests of his mother to remain home until morning. He took with him a large number of law books, saying he was not going to study Latin and mathematics any more. He stayed in this cottage three weeks. He cooked his own meals. He then left suddenly, came home, and said that he was going to Middlebury college, at Middlebury, in the State of Vermont. He went to Middlebury. He did not enter the college. He stayed in a small farm house for two or three weeks. He then went to Williamstown, Massachusetts, to enter Williams college. He did not attend Williams, but rented a small farm house located in the hills about seven miles from Williamstown. He then announced that he had discovered that in order to become strong he should live on ordinary cow bran. He carried a bag of this bran, weighing fifty-five pounds, from Williamstown to his cottage, seven miles distant. He stayed in this cottage for two months. He then came home for a week. He went back to Williamstown. He stayed there for a week. He returned home. His family planned a camping trip. His father, mother, brother and sister and himself started out. He slept with his brother in a tent. When the family had retired they were awakened by the cries of the defendant's father, saying he had been attacked. He had been attacked. Several violent blows had been made on his head with a hatchet. He had thrown up

his arms to protect his head and one arm was cut severely.
The hatchet was found in the bed of the defendant with blood
upon it. Upon being asked if he had struck his father he
said, "why then I must have struck him." He wrapped him-
self up and went to sleep. He gave no explanation of his
conduct. He showed no grief. There had been no friction
between his father and himself. He was then examined by
a New York specialist and was committed to a sanatorium
at Beacon, New York. He was there for four months. He
never spoke unless spoken to. Frequently he would not an-
swer when addressed. He refused to leave his room for long
periods of time. He insisted upon remaining in his room
naked. He could not be induced to cross a place where the
sun was shining. He had homicidal manias. He required
two attendants. His moods changed frequently. He ran
away from an attendant and succeeded in getting across the
Hudson river to Newburgh, where he was apprehended by a
police officer. He left this institution and returned to his
father's home. He insisted that the only thing he wanted
to eat was round steak, and nothing else, which he had
three times a day. He soon changed from this to roquefort
cheese and ate this three times a day. He was taken for
treatment to a Dr. Emerson in Boston. He procured a weigh-
ing machine and weighed all the food that he ate. He soon
returned home. He insisted that he must have salt pork
with every meal. He also said it was impossible for him
to go upstairs and insisted upon living downstairs. He ob-
tained a mattress and slept downstairs. He then became
possessed of the idea that he must eat rye bread and no
other kind. He made trips to various cities for the purpose
of finding a certain kind of rye bread. He bought some in
a shop in Jersey City. He made frequent trips to Jersey City
in order to buy this. It could be obtained in any bakery.
He then changed his diet to pumpernickle, which he went to
New York City to buy. He slept for two weeks in a coal
bin. Arrangements were made for him to take a trip to the
south with his father. He did not appear at the railroad
station. His father returned home. He then said he must

go alone. He went to Tennessee by train and then walked through the hilly section of Tennessee. He returned home for a week and then went to Jacksonville, and there took a Danish steamer for Hamburg, Germany. He telegraphed from Hamburg for money to come home. When he arrived home he stayed twenty days. He entered Columbia college. He remained between two and three weeks. He then announced that he was going for a trip through the Alleghenies. After again returning for a short period to his home he took up a bricklaying course at the New York Y. M. C. A. He went to Hartford. He found employment as a bricklayer. He then began to make pom poms. He installed machinery for this purpose in his room. He found employment as a mail carrier. He gave this up and went to New York City to go into the pom poms business. He was next heard of from Clifton Springs, New York. He was in the custody of the police authorities there. His discharge was obtained. He then returned to Columbia college. His mother was then informed that he was again arrested at Clifton Springs. She went there. She was informed that they thought her son was insane. She agreed to have him committed in New Jersey or New York. He had gone to Clifton Springs to see a scout master who had been at Montclair. He was then examined by physicians and later committed by Judge Brennen, of the juvenile court of Essex county, to the Overbrook Hospital for the Insane. There he assaulted the night attendant. He was confined to a strong room reserved for violent patients. He would rush at the door to break it down. At one time four guards were required to hold the door. He walked about his room naked. He had delusions that his food was poisoned. He wanted to be called "Tessie," saying that he was a female. He would take off his clothes before other patients. He proposed marriage to his attendant. He refused to wear shoes. He became violent, tearing the sheets and pulling down the curtains of his room. He would not eat for two or three days at a time. At other times he would eat ravenously, disregarding table utensils and using his hands. His habits were abnormal. He was in the institution

from February 25th, 1925, to June 28th, 1925, when he escaped. He went to his home. His mother promised to return him to the Overbrook authorities. He then took his sister's bicycle and rode to New York City. He was taken by a police officer in New York City to Bellevue Hospital. At Bellevue he was examined by a physician who pronounced him insane and suffering from a form of insanity known as *dementia præcox*. His father took him from Bellevue Hospital against the physician's advice. He was in New York for a while and then returned to Montclair. Then the occurrences of September 3d, 4th, 5th and 6th, heretofore related, took place.

The case is before us under the one hundred and thirty-sixth section of the Criminal Procedure act. Both assignments of error and specification of causes for reversal have been filed. The former number, seventy-nine; the latter, fifty-one. The record comprises upwards of nine hundred pages. The briefs filed for the state and defendant contain two hundred and ninety-eight printed pages of argument and authorities.

Many of the assignments of error and specifications of causes for reversal have not been argued orally or in the briefs. These will be deemed to be abandoned under the numerous authorities to this effect. Some of the points argued, although considered in conference, will not be dealt within this opinion because we feel that the case is controlled by the questions herein considered.

Upon being indicted, the defendant was brought into court to plead to the indictment. Counsel stated to the court that the defendant was insane, and cited to the court the case of *State* v. *Peacock,* 50 *N. J. L.* 34, in which the late Mr. Justice Reed, of the Supreme Court, said: "It is undoubtedly the law that a person, who, by reason of insanity, is unable to comprehend his position, and of making his defense, cannot be placed upon trial for a crime. If the court, either before or during the progress of such a trial, either from observation or upon the suggestion of counsel, have facts brought to its attention which raises a doubt of the condition

of defendant's mind in this respect, the question should be settled before another step is taken. The method of settling this preliminary question, where it is not the subject of statutory regulation, is within the discretion of the trial court. The court can itself enter upon the inquiry, or submit the question to another jury impaneled for that purpose." Counsel for the defendant also made the contention that by reason of the adjudication of the insanity of the defendant that the presumption of sanity had been destroyed and the presumption of insanity had taken its place. The court thereupon deferred the consideration of the plea until September 21st, 1925. On the postponed date an affidavit was handed to the court. The affidavit had been made by a member of the bar of the State of New York. The affiant stated he knew the defendant and had known his family for upwards of twenty years; that in his opinion the defendant was insane, unable to comprehend his position, and unable to assist counsel with his defense. The court announced that it had decided that the defendant should enter a plea. An exception to this ruling was taken. The defendant was then arraigned, and upon being asked how he would plead made no response. The court then said, "the defendant does not answer. A plea of not guilty will be entered." No exception was taken to this ruling. The court then announced that it intended to take testimony on September 24th, 1925, as to whether or not the defendant was able to go on with the trial under the plea that had been entered to the indictment. The record in the case then contains upwards of three hundred pages of testimony relative to the mental condition of the defendant. The state produced a number of prominent alienists who, although admitting that the defendant was suffering from a form of insanity known as *dementia præcox,* testified that he was, in their opinion, able to consult with counsel and to aid in the conduct of his defense. The defendant produced a number of well-known alienists who testified that the defendant was insane, suffering from *dementia præcox,* of a form known as *catatonia dementia præcox,* and that in their opinion was incapable of rationally comprehending the

condition in which he was and of aiding his counsel in the conduct of his defense. The trial judge, in an opinion which is embodied in the record, considered the testimony and reached the conclusion that the prisoner was able to comprehend his position and make a rational defense. To the order of the trial court that he should stand trial upon the indictment, an exception was duly taken.

It is first contended in behalf of the defendant that the court erred in directing a plea of not guilty to be entered; that the defendant stood mute, when called upon to plead, and that it was error for the court to find as a fact that the defendant refused to answer and to direct a plea of not guilty to be entered. The law upon this subject has been embodied in section 58 of the Criminal Procedure act. 2 *Comp. Stat.*, *p.* 1839. This section provides that if the defendant shall stand mute when arraigned, a jury shall forthwith be empaneled to try the question whether the person so standing mute standeth mute obstinately or by the providence and act of God. The section further provides that where any person shall refuse to plead or answer to an indictment a plea of not guilty shall be entered and the case shall proceed to trial. The record in this case returned to us under the writ of error states that the defendant, "refusing to plead to said indictment, the court   *   *   *   ordered a plea of not guilty to be entered." To hold in this court, in view of the record in the case, that the defendant, when called upon to plead, stood mute, would be to contradict the record before us. The record imports absolute verity. In the case of *State* v. *Savage,* 79 *N. J. L.* 583, which is a decision of this court, it was held that where the record presented to the court reveals that a plea of not guilty to an indictment was ordered to be entered by the court under the provisions of the fifty-eighth section of the Criminal Procedure act, upon the defendant refusing to plead, this court would not consider the question as to whether or not the defendant had stood mute. In the state of the present record we are of the opinion that the question sought to be raised by the defendant is not properly before us. If the record is wrong it should have been cor-

rected by the methods pointed out in the case of *Gibbs and Stanton* v. *State,* 45 *Id.* 379.

We are next asked to review the testimony taken by the court upon the subject of the preliminary investigation as to the mental condition of the defendant, and hold that the weight of the evidence is contrary to the decision reached by the trial judge. We know of no precedent which would justify such a review by this court. The question was one peculiarly within the province of the trial judge to determine. It was the trial of an issue of fact similar to the determination of the question as to whether a witness is competent to testify when his competency, upon being offered as a witness, is challenged. It is also like the ruling by a trial judge upon the question whether or not a witness offered as an expert is qualified to testify as an expert. The rule which applies to a finding of fact of this character by the trial court is that such a finding is not reviewable upon appeal if there is any legal evidence to support the finding of the court. *Leonard* v. *Standard Aero Corporation,* 95 *N. J. L.* 235. There was evidence which would support the finding made by the court in this case.

With reference to the placing of the defendant upon trial, it is also contended that at the time the defendant was called upon to plead he was legally in the custody of the Essex County Hospital for the Insane, and not legally before the Court of Oyer and Terminer. We see no merit in this contention. The fact that a person has been adjudicated a lunatic does not mean that he is exempt from prosecution for the commission of a crime. Insane persons may be adjudicated insane and be committed for the protection of the public against violence, or for the care and cure of the person committed, or for the conservation and management of the lunatic's property. A regular inquisition is not conclusive. In cases of confinement, where the confinement is made for the protection of the public or for the care of the individual, the commitment is evidential of nothing more than a condition justifying the confinement. A commitment adjudges no more than that it is necessary to confine the

patient for the good of the public or himself, or both. The fact that a person has been committed as insane has no necessary relation to the question whether such a person can intelligently go to trial for a crime. Persons having some forms of insanity are as responsible for crimes committed by them as normal persons. It was not error to put the defendant to a trial merely because he had been committed to a hospital for the insane.

Counsel for the defendant next argues a number of assignments of error and specifications of causes for reversal that relate to the propriety of the trial court's ruling with reference to the admission in evidence of testimony relating to the kidnapping and killing of Mary Daly. There were also references to these matters in the opening address for the state, to which objection was made by counsel for the defendant. It is contended that the testimony and references relate to a crime other than that for which the defendant was on trial. This question frequently arises with reference to testimony as to prior acts leading up to the particular crime for which the defendant is being tried. In the present case the crime for which the defendant was being tried was one which occurred in preparation for the execution of another crime, namely, the kidnapping of Mary Daly. The defendant believed he needed a stolen car for the purpose of kidnapping the little girl. He had to kill the driver of a car in order to obtain possession of the car. The testimony admitted was relevant on the subject of motive, and in our opinion the trial court did not err in admitting the testimony and permitting the references thereto. Where there is a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, evidence thereof is admissible, and such evidence does not fall under the condemnation of testimony relative to other offenses than the one for which the defendant is on trial. *People* v. *Molineux,* 168 *N. Y.* 264.

Counsel for the defendant contends that the confession made by the defendant was improperly admitted by the trial

judge. The substance of this confession has been heretofore related. It included, not only the killing of Pearce, but the kidnapping and killing of Mary Daly. It will be recalled that the defendant was offered money to tell where Mary Daly was. He was also promised that he would not be taken back to the Overbrook Hospital for the Insane. Mr. Daly, the father of Mary Daly, told the defendant that if he would tell him where his girl was he would not prosecute him at all. It was natural that a parent, suffering as Mr. Daly was, should offer such an inducement to the defendant. The offer of Mr. Daly was, apparently, acquiesced in by the experienced officers and detectives present at that time. The state contends that the confession was voluntary, and that the inducements offered to the defendant to make it were promises of a collateral boon or benefit which did not make the confession involuntary. In the case of *Roesel* v. *State,* 62 *N. J. L.* 216, Mr. Justice Depue said: "The promise or hope excited must relate to some benefit to be derived by the prisoner in the criminal prosecution, though it is necessary to the admissibility of a confession that it should have been voluntarily made—that is, that it should have been made without the pressure of hope or fear from persons having authority—yet it is not necessary that it should have been the prisoner's own spontaneous act. It would be received though it were induced by a promise of some collateral benefit, or boon, no hope or favor being held out in respect to the criminal charge against him." This statement of the law was approved in *State* v. *Kwiatawski,* 83 *Id.* 650. The promise to pay Noel $4,000 or more, and the promise not to send him back to the Overbrook Hospital, did relate to benefits entirely outside of the present criminal prosecution. The offer of Mr. Daly to the defendant, that he would not be prosecuted at all if he would tell Mr. Daly where his little girl was, was broad and all embracing. The state contends that this related to the charge of kidnapping only, and did not relate to either murder charge. We are not inclined to accept this view, but as the question of whether or not a confession is voluntary is one for the decision of a trial

court, and as the confession was made by Noel some fourteen or fifteen hours after the offer of immunity was made to Noel by Mr. Daly, in the presence of the officers, and after many things had, during this period of time, transpired, we cannot say that the trial judge was not justified in finding, as a fact, that the confession was voluntary as the length of time occurring between the offer of Mr. Daly and the making of the confession, was evidence that the confession was not induced by the offer. This would support the finding of the trial court that the confession was voluntary. Moreover, Noel had admitted to so many of the alienists who examined him, and to others who testified that he had killed Mary Daly, that the admission of the confession was in no sense harmful or prejudicial to the defendant, as everything contained in it was, in effect, proven *aliunde* the confession.

It is next insisted that the charge of the court was erroneous with respect to the definition of murder in the second degree. Admitting this to be so, it was not prejudicial to the defendant. The defendant was convicted of murder in the first degree. Murder in the first degree was properly defined in the charge. It, therefore, was immaterial whether murder in the second degree was properly defined. The same question has arisen in two recent cases in this court where the definition of murder in the second degree was the same as that given by the court in the present case. These are the cases of *State* v. *Mosley, ante, p.* 94, and the case of *State* v. *Martin, ante, p.* 388. In these cases this court held that no harm had been done to the defendant by incorrectly defining murder in the second degree. In his charge to the jury the trial judge stated that Dr. Markens, a witness called in the state's main case, testified that the defendant knew the distinction between right and wrong. This witness did not so testify. It was a statement of a fact of importance which was directly contrary to the evidence. At the conclusion of the charge counsel for the defendant took an exception to this portion of the charge, specifically calling the court's attention to the fact that the court had stated that Dr. Markens had testified that the defendant knew the ⸍

distinction between right and wrong, and that he had not so testified. The trial judge did nothing to correct this statement in the charge after his attention had been directed to it. The state contends that it was mere comment and not a statement of a fundamental fact, and that the following portion of the charge sufficiently apprised the jury that they were not to rely on the court's statement of the evidence, viz.: "The jury, however, are the sole judges of the facts— that is, the weight of the evidence, the credibility of the witnesses, and, as judges of the facts, you have a right to draw such inferences from the facts as you see fit. If I, in referring to the testimony, omit some parts which you think are important, or, if I emphasize some part of the testimony which, in your judgment, is not justified, of course you are not to follow the court in its deductions as to the evidence. I am not attempting to decide this case upon the facts, and any reference that I make concerning evidence is only with the hope of elucidating that testimony." We do not think this part of the charge corrected this erroneous statement. We also do not deem the statement mere comment. It was a misstatement concerning the evidence on the most important question the jury had to decide. It is not like the case of *State* v. *Serritella*, 90 *N. J. L.* 343 (cited by the state), where the trial judge stated in his charge that one of the witnesses had been corroborated by one of the other witnesses, who says, &c. Neither in the passage of the charge above quoted, or elsewhere in the charge, was the customary statement made that the jury must not accept the court's statement of the evidence unless it coincided with their own recollection of the testimony. In the case of *Smith & Bennett* v. *State*, 41 *Id.* 370, a misstatment with relation to a fact of moment—that is, that it was proved, when there was no testimony to support it, was held to constitute reversible error. In the present case we are of the opinion that upon this ground the judgment should be reversed.

It is next contended that the court erred in charging the jury as follows: "The defendant had not taken the stand. You may consider that as a circumstance in this case. The

fact that he did not take the stand, of course, cannot be used against him, but the circumstances of the fact that he did not take the stand may be considered by you." The last clause of this excerpt from the charge impairs its clarity. The criticism leveled at it appears to be, however, that the court should have charged the jury in what respect the failure of the defendant to take the stand might be used against him. If the defendant's counsel desired any further instructions on this subject they should have been put in the form of requests to charge. We do not consider what the court said was prejudicial to the defendant.

Counsel for the defendant next argues that the trial court erred in refusing to charge various requests submitted to the court in the defendant's behalf. We have examined these and are of the opinion that they were properly denied as either unsound or substantially charged. We think it necessary to consider only those bearing upon the question of the test of criminal irresponsibility by reason of insanity. These requests were an effort upon the part of counsel for the defendant to break down the test of insanity which has obtained in this state since the charge of Chief Justice Hornblower, in the case of *State* v. *Spencer*, 21 *N. J. L.* 196, and followed in numerous cases, of which the most notable are *State* v. *Graves*, 45 *Id.* 203, 347; *State* v. *Genz*, 59 *Id.* 488, and *State* v. *Mackin*, 59 *Id.* 496. The argument advanced to dethrone the test of insanity when offered as an excuse for crime adopted eighty years ago in this state is that during these years the science of medicine has advanced and those devoting themselves to the study of mental diseases have increased in wisdom and learning to the point that they have demonstrated that the test to which our courts have so long adhered is obsolete and for it should be substituted either the rule of irresistible impulse, or that of permitting the jury to pass upon the question as to whether the defendant is affected mentally, and if so, to either aquit him or reduce the grade of the crime to murder of the second degree.

We here reaffirm the test of sanity in a criminal case as laid down in the Spencer case. We do not do so because of

its antiquity. We do so because we believe that it is the best test which has as yet been promulgated. It may not be scientifically perfect in the opinion of those most learned on the subject of mental disorders, but it has during all these years proved to be workable and a safeguard for the security of life and property. There are many rules of law which are not perhaps logical. They can, from the standpoint of logic, be successfully attacked; yet, many of these laws have remained unaltered by statute or decision because they have stood the test of practical trial. Our courts are not schools of logic. They administer the law and the law should not be changed because a case arises in which its application to the facts appears to result oppressively. In every jurisdiction in which the rule that one who consciously commits a crime and knows the difference at the time of its commission between right and wrong has been impaired personal security and property rights have suffered. Upon this branch of the case we feel we can best express our views by quoting the language of the present Chief Justice in the case of *State* v. *Carrigan,* 93 *N. J. L.* 268; *affirmed,* 94 *Id.* 566, who said: "We consider to be unsound the suggestion that the law recognizes a form of insanity in which the faculties are so affected that the person suffering from it, although he perceives and appreciates the moral quality of his acts, is unable to control them and is urged by some mysterious pressure which he cannot resist, to their commission. It may be that such a mental condition is recognized by medical or scientific authority, but the doctrine that a criminal act may be excused or mitigated upon the notion of an irresistible impulse to commit it, where the offender has the mental capacity to appreciate his legal and moral duty in respect to it, has no place in the law."

This brings us to the consideration of the question as to whether the verdict is contrary to the weight of the evidence under the statute enacted in the year 1921. *Pamph. L.* 1921, *p.* 951. The only portion of the evidence which it is necessary to review is the evidence which deals with the question of the defendant's sanity. The admissions of the defendant,

the confession, and the circumstantial evidence of the killing of Pearce prove conclusively that the defendant killed Pearce. In the consideration of the present question we are aided very much by the very frank statement of the state's counsel, made in his brief. This statement is as follows: "The evidence in this case demonstrates beyond question that Noel, at the time of the commission of the crime and for a year or two theretofore, was insane, suffering from a well-recognized disease of the brain, *dementia præcox*. He was not a border line case, but a typical lunatic." The diagnosis of Noel's mental disorder by the medical experts who testified both for the state and the defendant are, in effect, identical. They all, with one exception, testified that the defendant was suffering from a disease of the brain known as *dementia præcox*. Some of them referred to it as a form of *dementia præcox* known as *catatonia dementia præcox*. This form renders the subject at times uncontrollable. The evidence showed that Noel had hallucinations, mental retardation, negaticism, muteism and practically every one of the objective symptoms typical of a case of *dementia præcox*. One of the accompaniments of *dementia præcox* is the idea of a split personality. The person affected thinks himself in the personality of someone else. The question naturally arises whether a person who believes himself someone else can be held to the standard of determining whether the act of killing a human being is right or wrong. The argument advanced in behalf of the state is that in the commission of the crime for which the defendant was tried he showed by his acts that he knew the difference between right and wrong. The fact that he hid the body of Pearce; that he concealed the taxicab; that he did not tell his mother that he shot Pearce, and that for a time he denied his offenses and claimed to have been in Morristown on the day of the kidnapping of Mary Daly, were evidence of the fact that Noel knew the difference between right and wrong. We think this argument is met first by the fact that one who is insane and who commits a crime can go through certain mental processes without comprehending the quality of the act on which he is engaged or knowing the difference between

right and wrong. We know from experience that if a lunatic, wholly demented, kills a person, that he goes through a process of reasoning by which he knows that he must have some instrument to do the killing with, and that he must procure a weapon for that purpose. He may be, apparently, logical in this respect, yet wholly devoid of such a mentality as would distinguish between what was right and what was wrong.

In connection with the present crime there are many features of it which seem unexplainable, except upon the theory that the defendant was demented. Noel did not ascertain whether there was any little girl who resided at 136 Upper Mountain avenue. As a matter of fact there is no evidence that the occupant of the residence had a little girl. He appears to have been impressed with the character of the residence and thought that there must be a little girl who resided there whose parents would give a ransom if she were kidnapped. After he had killed the child he then telephoned to his residence and asked if they were interested in a little girl of her description, and then made the remark that there were many banks open in the theatre district in upper New York City. Certainly, this message was without meaning under the circumstances. The child had been killed. She therefore could not be ransomed. His answer to one of the experts called by the state as to how the ransom money was to be paid indicates the condition of the defendant's mind, because it is admitted by all that there was no evidence of the defendant's shamming. When asked how he was to receive the sum of $4,000, he said that he had addressed a postal card to one Edward Brown demanding that the sum of $4,000 be taken on the eight twenty-two train to Philadelphia, and when they saw a red balloon being waved on the side of the tracks they were to throw the money out. These instances could be from the voluminous record in the case multiplied. We see, however, no useful purpose in so doing. We are satisfied, after a review of the entire testimony, that the defendant was so insane as to be irresponsible for the crime for which he was convicted. We think he did not understand the quality

of the act and did not know the difference between right and wrong when it was perpetrated. In arriving at this decision we feel that we are supported by the weight of the expert medical testimony, the history of the defendant during the two years prior to the commission of the crime, the evidence of those attending him (physicians and attendants) at the Overbook Hospital for the Insane, who had an excellent opportunity of judging his sanity from observing his actions. The law has always been zealous in the protection of one who has lost his reason. If, after trial, the defendant becomes insane, execution is stayed. To execute one bereft of reason would afford no example to others. It would be cruel and inhuman. The law is zealous in permitting one condemned to death to make his peace with the Almighty, before he pays the penalty of his crime. This expiation cannot be made by one who is insane. In reaching the conclusion which we have in this case we are not unmindful that the acts of the defendant have saddened the lives of many. The execution of this unfortunate defendant would not bring back the victims of his disordered intellect. There are many things in life which must be endured. The errors of the past guide us in devising measures of protection for the future.

The judgment of conviction is reversed.

MINTURN, J. (concurring). My concurrence in the reversal of this conviction rests, in the main, upon the views entertained by a majority of the court, but my reasoning of the situation seems to require, in view of the extreme abnormality of the case, a succinct statement of my views.

To convict this defendant of murder in the first degree it was necessary for the state to prove that he committed the crime willfully, with premeditation and deliberation, and that, possessing those inherent qualities or normality and mentality, he was guilty, upon the evidence, beyond a reasonable doubt. The statutory definition of the crime is but a compendious statement of the common law, as enunciated by Chief Justice Lord Kenyon in 7 *T. R.* 514, wherein he declares: "It is a principle of natural justice and of our law

that the intent and the act must both concur to constitute the crime." Our books are replete with cases elaborating this principle, but the question, like the riddle of the Sphinx, recurs in our jurisprudence as it does in the various phases of mental and moral philosophy. When and under what circumstances can it be said that a mind, conceded by all to be perverted and demented beyond hope of normal reconstitution, can be legally held answerable for the criminal excesses it inspires?

Pages have been written *pro* and *con* since the days of Aristotle, by philosophers of various schools of thought, eventuating in the modern schools of Kant, Spencer and Nietsche, bearing upon the moral responsibility of a mind, diseased to such an extent, as to be incapable by the exertion or manifestation of the faculty of the will, of controlling the direction and exercise of its corporal powers.

Throughout these various expositions, however, the crucial test of moral responsibility has been centered upon the assumption that the being under observation was in control of his will power, for it is inconceivable that there can be any satisfactory test of moral or criminal responsibility where the will of the subject becomes entirely dormant or absolutely inactive, so as to be in essence eliminated as the dominant moral factor in the physical execution of the crime; and thus we have it expressed as a cardinal doctrine of the Roman law, based upon the philosophy of Seneca, Epictetus and Marcus Aurelia, *Actus non facit reum nisi meus sit res.*

The same essential doctrine presents the basis of responsibility under the Judaic code, as well as under the fundamental Christian philosophy outlined by Thomas Aquinas, and that great galaxy of scholastics of the Middle Ages, beginning with Albertus Magnus and terminating with Dunscotus, as a result of whose learned dissertations the fundamental rule of Christian philosophy has been evolved, that responsibility for moral error or crime must be based upon the possession of the three basic moral faculties, will, memory and understanding.

Under the Judaic dispensation, one lacking these mental essentials was practically isolated from human contact, and classed as one possessed of a devil, and hence, during the earlier career of the Christian Founder, we find Him frequently engaged in exorcising a devil at the earnest entreaties of zealous supplicants. During the later Christian dispensation, this sense of mentality and moral responsibility was supposed to be the result like the plagues of Egypt, of a divine interposition, and one so afflicted was possessed *"ex visitatione Dei."* But at all times, and under every school of dialectics and ethics, the basic test of individual responsibility for crime was the existence of a controlling will power capable of directing the physical entity in the commission of crime, so that 4 *Bl.* 344, declares: "All the several pleas and excuses, which protect the committer of a criminal act from the punishment which is otherwise annexed thereto, may be reduced to this single consideration, the want or defect of will;" and again, "As a vicious will without a vicious act is no civil crime, so an unwarrantable act without a vicious will is no crime at all." Book 4, page 344.

Our statute in premising what elements of mental activity shall be deemed necessary to constitute murder in the first degree, recognizes this fundamental distinction by declaring that the crime shall consist of an act "willful"—that is, an exercise of the will power "deliberate" and "premeditated," which expressions essentially connote the power to reason, and to cogitate for any reasonable period of time upon the nature and enormity of the act about to be committed. If the accused lacked any of these essential prerequisites as a basis for the crime, while he may be found guilty of any other degree of murder, he cannot be found guilty of murder in the first degree. Yet for many centuries the law has found itself in a state of flux as to the test to be applied for the purpose of determining whether one thus charged possessed the faculties of individual responsibility to which we have referred. A legal test of some nature was deemed essential for the proper prosecution of the law, and courts during various stages of legal evolution en-

deavored with varying success to adopt a test which would measure up to the requirements of our humanity and civilization, and prove satisfactory in its practical results to safeguard the body politic.

Lord Hale, who tried most of the important state cases of his time, laid down the theory that a defendant was responsible if he possessed as much sense as an ordinary fourteen-year-old child. This test many years prevailed, and was known as "the child test." About 1724, Chief Justice Tracy, of the Kings Bench, introduced the test that, to be relieved of responsibility, a defendant must occupy such a mental status that "he doth not know what he is doing more than an infant, than a brute or a wild beast." This was termed the "wild beast test."

In 1840, Lord Denman laid down the test in a case involving an attack upon the queen's life, that if the prisoner knew "the right and wrong" of the act he was committing he was legally responsible. This test stood as the law of England, and in the last century was substantially adopted as the final word upon the subject, as the result of a parliamentary inquiry, based upon what is known in the books as *M'Naghten's case,* 10 *Clark & F.* 200. The report of the law judges upon that inquiry was that the defendant was to be held responsible "if he knew at such time that he was acting contrary to law." This test manifestly imposed upon a defendant *non compos* the possession of knowledge and mentality sufficient to enable him to realize that the act he was perpetrating was contrary to law, and in that respect practically relegated him to a mental status equivalent to that possessed by the normal being. Nevertheless, the rule thus promulgated has since been followed by the British courts, and quite generally by the American courts, notwithstanding severe criticism thereof upon religious moral and metaphysical grounds. Its conspicuous adoption in this country was presented in Massachusetts in *Commonwealth* v. *Rogers,* 7 *Met.* 500, where Chief Justice Shaw, in a learned analytical opinion, followed it for the Supreme Court of that state. Our Supreme Court, in an opinion by Chief Justice Horn-

blower, in *State* v. *Spencer,* 21 *N. J. L.* 210, in the year 1846, declared it to be the law of this state, and it has been followed in a multitude of adjudications from which it may now be declared that beyond cavil the test in this state, as thus definitely settled by the learned Chief Justice, is "was the defendant conscious that he was doing what he ought not to do." The later adjudications in this court have so moulded the formula as to reduce the test to the simple inquiry whether the defendant at the time he committed the act knew the difference between right and wrong. *Mackin* v. *State,* 59 *Id.* 495. The rule thus established, after a legal analytical examination and test of years, is now too firmly imbedded in the law of this state, to be changed or disturbed by any command short of legislative mandate containing a different formula. Its application, however, in any case, must be made in view of section 17 of the Crimes act (*Comp. Stat., p.* 2), which defines murder in the first degree as an act both "willful, deliberate and premeditated," so that a defendant to be held responsible must, not only possess sufficient mental ability to be able to distinguish right from wrong, but must also be able mentally to so utilize that ability as to possess will power sufficient to inaugurate or resist its perpetration. If it be in evidence, therefore, that at the time he did not possess these faculties, his deed must be reduced *ex necessitate* to murder of the second degree, or to manslaughter, but he cannot be convicted of murder in the first degree.

The charge of the learned trial court in the case at bar, after an exhaustive presentation of the law and fact, left no discretion to the jury upon that question, but, in effect, while defining the crime correctly, elaborated as the crucial test of guilt upon the moral and legal test of defendant's consciousness of right and wrong. Thus, the court declares: "The question raised by the defense is not whether the defendant was ever insane at a prior time of his life * * * but whether the accused at the time of the doing of the act was conscious that it was an act which he ought not to do. If he was not conscious of this he ought to be acquitted. If

he was conscious of this he cannot be exculpated on the ground of insanity, and he is then amenable to the law." We thus have the judicial test as expounded by the cases, fairly applied without the presence at the same time of the necessarry statutory test, which, in fact, defines and creates the crime, and includes the will power, the power of deliberation and premeditation as *sine qua non* to its commission. In consonance with this test of legal responsibility, as the essential basis of conviction, is the testimony of the entire array of alienists, all of whom had their attention directed and limited to the single inquiry whether the defendant at the time was conscious of the difference between right and wrong.

The jury, practically, by this testimony, and the whole trend of evidential procedure, had their minds dominantly focused upon that inquiry, as the basic and essential test of defendant's mental and legal responsibility, and all opportunity for any verdict, except that of guilty in the first degree or acquittal as the alternative, was thus inferentially, at least, obliterated from the record.

While alleged procedural errors have been dwelt upon extensively in the arguments and the briefs, they may be omitted from consideration here as *ratio decidendi,* owing to the fundamental considerations to which we have adverted.

One procedural error, however, stands out conspicuously, and its vital importance to the defendant requires us to notice it *in extenso,* as a reason for reversal. In all jurisdictions, either under the Roman law or the common law, a preliminary trial as to the defendant's sanity was deemed a prerequisite to putting him on trial, upon the merits, or of requiring him to plead to the indictment, or, finally, for the purpose of imposing sentence upon him, whenever from the history of the case, or the record itself, the fact was brought home to the trial court, that the defendant was, apparently, *non compos mentis.*

This conception of the law is probably best expressed by Sir Edward Coke: "The execution of an offender is, for example, *ut prena ad paucos metus ad omnes perveniat;* but,

so it is not when a madman is executed; but should be a
misearable spectacle both against law and of extreme in-
humanity and cruelty, and can be no example to others."
3 *Inst.* 6. So, Blackstone observes, "if there be any doubt
whether the party be *compos* or not, this shall be tried by a
jury." 4 *Bl.* 346. That rule has been followed in this state,
and in *State* v. *Peacock,* 50 *N. J. L.* 34, 36, the Supreme Court
observed: "It is undoubtedly the law that a person who, by
reason of insanity, is unable to comprehend his position, and
of making his defense, he cannot be placed upon trial for a
crime."

. In this instance the defendant failed to plead, and the
court ordered a plea of not guilty entered. In other words,
the prisoner stood mute, said nothing, and the trial upon a
plea of not guilty interposed by the court thereafter pro-
ceeded as if the prisoner were sane. At common law in such
an exigency, the court ordered a jury "impaneled to inquire
. whether the defendant stood mute, obstinately, with the
power and mental ability to plead, or whether his failure to
answer was due to his mental lapse *ex visitatione Dei.*"

Our statute upon the subject, following that of 7, 8 *Geo. IV,*
*ch.* 28, provides that where a prisoner stands mute: "A jury
shall forthwith be impaneled to try and say whether the per-
son so standing mute standeth mute obstinately and on pur-
pose, or by the providence and act of God, and if the latter
prove to be the case, the trial shall not proceed against him,
but he shall be remanded to prison until he shall have re-
covered his reason." 2 *Comp. Stat., p.* 1839, § 58.

In the case at bar, instead of adhering to this procedure,
the learned trial judge visited the prisoner in his cell, and
after a process of observation and inquiry, pronounced him
sane and placed him upon trial. That the prisoner stood
mute in this instance, if the word mute be accorded its ordi-
nary signification, cannot be reasonably gainsaid, and stand-
ing mute, it was the duty of the learned court to try the issue
of his sanity as a condition precedent to his trial, upon the
indictment. *Commonwealth* v. *Braley,* 1 *Mass.* 103. An ob-
jection in the interest of the defendant was not necessary

since the court, in view of the acknowledged facts, and conceded record of the defendant, as a matter of public policy, in *favorem vitæ,* was called upon to order a jury trial as to his sanity. His was not the case of a pretender or dissimulator, but his entire life record was so permeated with the evidences of insanity, and also supported by an adjudication of the juvenile court, pronouncing him insane, and confining him to the Essex county penitentiary for the insane, that there were at least reasonable and plausible grounds which inevitably led to that conclusion, and upon which the question could reasonably be tested before a jury.

In the language of *State* v. *Peacock, ubi supra:* "If the court, either before or during the progress of the trial, either from observation or upon the suggestion of counsel, have facts brought to it, which raises a doubt of the condition of defendant's mind in this respect, the question should be settled before another step is taken." Here the attention of the learned court was so emphatically directed to the abnormal condition of defendant's mind that he felt it incumbent upon him before trial to visit the defendant, interview him, and personally pronounce upon his sanity. In such a status where the question involved is the life or death of a defendant, technical procedural refinements should not supervene to stay the corrective hand of all pervading remedial justice, and if there be one function of appellate jurisdiction which courts of final review have vindicated by the protecting arm of public policy, and the humanizing safeguards of the constitution, regardless of its disclosure by the record, it is the public policy in *favorem vitæ* underlying the body of the law, as well as the fundamentals of jury trial arising from a consideration of the constitutional provisions safeguarding human life, whether pleaded or not. *State* v. *Savage,* 79 *N. J. L.* 584; *McMichael* v. *Horay,* 90 *Id.* 142; *State* v. *Shupe,* 88 *Id.* 610.

Finally, to convict this defendant of murder in the first degree, his legal guilt must be evident upon the record, beyond a reasonable doubt. Alienists concede his insanity, and counsel for the state admits it; the brutish, hideousness of

a life consigned irretrievably to the conception and execution of fiendish designs upon his fellow-men, including those nearest, and, in the normal order of nature, dearest to him, stamp him indelibly as the physical·embodiment of a living torture, to whom death must prove a haven of relief. But to such an inhuman being, dissolution must come as nature, and the Divine dispensation from the birth of time ordained it. A living death, a life long inferno, consumes him with the passing of each day. *Furiosa furore solum punitur.* Our ·duty in the enforcement of law will have been performed when we so restrain his maniacal propensities as to allow him in the fiendish purgatorio of his certain earthly doom to prey upon himself to the final consummation, at the same time protecting from the ravages of his foul disease those to whom as the guardians of the law we owe the duty of protection.

For these reasons the judgment of conviction must be reversed.

KALISCH, J. (concurring). I concur in the views expressed by the learned judge in the prevailing opinion leading to a reversal of the judgment of the court below upon the ground that the trial judge erred by making a misstatement with relation to a fact of moment as having been proved, whereas there was no testimony to support it, and also upon the ground that the verdict of the jury was against the weight of the evidence. My examination and consideration of the other questions presented in the case lead me to the following conclusions—first, as to the direction by the trial judge at the time the defendant was arraigned to plead to an indictment for murder, and, the defendant not answering, that a plea of not guilty be entered, in my judgment, was error requiring a reversal. A cursory statement of the facts leading up to the arraignment of the defendant will suffice to demonstrate that the privileges extended by the law to those mentally or otherwise physically afflicted were denied the accused.

On September 18th, 1925, Mr. Lane appeared in the court below, and after stating to the court that he represented a

Mr. Carpenter, who, in turn, represented the natural guardian of the accused, and who likewise was the next friend of the accused, but because of the absence of Mr. Carpenter, and at his request he appeared to move the court before any other act be performed to inquire into the sanity of the defendant. At the same time Mr. Lane presented to the court an adjudication made, under the statute, on the 24th day of March, 1925, by the Essex county juvenile court, adjudicating that the said Harrison W. Noel is insane, and a proper person to be confined in one of the institutions for the insane of this state, and ordered "that said Harrison W. Noel be finally committed to the Essex County Hospital for the Insane," &c. In support of the motion, the commitment of Noel as an insane person was offered in evidence. There was also before the court an affidavit of Mr. Barber, which affidavit, in substance, averred that, after the commission of the deed, the affiant, a friend of the Noel family and a lawyer of the New York bar of fifteen years' practice, visited Noel in the county jail and found the latter in such a mental condition as to be unable to comprehend his position and unable to assist counsel and unable to make a defense, &c.

Thereupon, the defendant's arraignment was postponed three days, and the defendant being brought into court the following colloquy took place between the court and counsel:

"Mr. Lane—If your honor has concluded to let this defendant plead, I ask your honor to permit us an exception.

"The Court—Yes, I have decided the defendant shall enter a plea."

An exception was allowed and was signed and sealed accordingly by the trial judge. Thereupon, the assistant prosecutor read the indictment to the defendant and he was asked: "How do you plead?" The Court—"The defendant does not answer. A plea of not guilty will be entered." The trial judge then announced that he would take testimony on the Thursday following in order that the prosecutor might determine whether or not the defendant was able to go on with the trial under the plea to this indictment. The theory

of the court, as expressed, was that it was within the province
of the prosecutor of the pleas to determine whether the de-
fendant was able to go on with the trial.  I assume, however,
that the statement was inadvertently made, because it does
appear that the trial judge finally determined the matter,
after a hearing in which testimony was taken, as to the
mental condition and ability of the accused to consult coun-
sel in the preparation of his defense.  But it seems to me
that the essential fact cannot be overlooked that the arraign-
ment of the defendant and the entering of a plea of not
guilty to the indictment against him when he failed to answer
to the question: "How do you plead?" after it had been
brought to the attention of the court that shortly before the
commission of the deed the defendant had been adjudicated
by a competent court to be insane, and had also before that
time been confined in a sanatorium, and was, before being
arraigned, in a mental condition so as to be unable to com-
prehend his position and consult with counsel, was a clear
violation of the rights of the accused, accorded him by law.
In *State* v. *Peacock,* 50 *N. J. L.* 34, Judge Reed, in deliver-
ing the opinion of the Supreme Court (at *p.* 36), said:
"It is undoubtedly the law that a person, who, by reason of
insanity, is unable to comprehend his position, and of mak-
ing his defense, cannot be placed upon trial for a crime.  If
the court, either before or during the progress of such a trial,
either from observation or upon the suggestion of counsel,
have facts brought to its attention which raises a doubt of
the condition of defendant's mind in this respect, the ques-
tion should be settled before another step is taken.  The
method of settling this preliminary question, where it is not
the subject of statutory regulation, is within the discretion of
the trial court.  The court can itself enter upon the inquiry,
or submit the question to another jury impaneled for that
purpose."

Thus, if the court, before trial, either upon its own ob-
servation or upon the suggestion of counsel, has facts brought
to its attention which simply raises a doubt of the condition
of the defendant's mind as to his sanity, that question should

be settled before another step is taken. It is an indisputable fact that the court's attention in the present case was drawn to authentic facts which raised more than a doubt as to the defendant's mental state, and that being so, it should then have halted any further progress in the case and not have proceeded with the arraignment of the accused. But this might not have been of any material consequence, in view of the fact that there was an inquiry made by the court as to the defendant's mental ability to assist counsel in the preparation of the defense, were it not for the circumstances that before such inquiry was made the court, upon its own motion, with notice of the defendant's mental state, nevertheless, upon the latter's failing to answer to the indictment, ordered the entry of a plea of not guilty, without giving the slightest attention to the provision of our statute which, in substance, provides that if a person be indicted for any offense, on being arraigned or called to answer, the defendant stand mute, a jury shall forthwith be impaneled to try and say whether the person standing mute standeth mute obstinately and on purpose or by the providence or act of God; and if they return their verdict that such person standeth mute by the providence and act of God, the court thereupon shall cause him to be remanded to prison and shall not proceed against him until he shall have recovered therefrom; but if the jury shall return their verdict that the person stands mute obstinately and on purpose, then the court shall cause to be entered upon the indictment against such person the plea of not guilty; that if a person shall refuse to plead or answer, the court shall cause a plea of not guilty to be entered. 2 *Comp. Stat., p.* 1839, § 58.

I think the question, therefore, whether the defendant was standing mute on purpose or by the providence and act of God should have been then and there submitted to a jury. The failure to do so was error prejudicial to the defendant. It is said that there is no bill of exception which raises the question. It seems to me that with the information which the trial judge had before him of the defendant's mental state, coupled with the statement that the court had decided

that the defendant should enter a plea to which an exception was duly taken, sufficiently raises the question.

Another objection made against a consideration by this court of the question raised is that in the return to the writ of error there is a statement that the defendant refused to plead to the indictment, and, therefore, the record must prevail; that in order for the defendant to avail himself of the alleged error in the record he should have applied to the court for an amendment thereof. But it seems to me that there is no substance to the objection. The trial judge certified that the above printed book contains the entire record of the proceedings had upon the trial, and that the above printed book, from page 1 to page 513, contains the entire record from the time of the directing of the entry of the plea of not guilty, &c. Taking the statement of the trial judge, made at the time and certified to by him to be a record of what took place, we have this situation, that because the defendant did not answer the question, How do you plead? the court, with full knowledge of the defendant's mental state, usurped the province of a jury by deciding that the defendant's muteism was a refusal to answer.

The direction by the court that a plea of not guilty be entered, and immediately thereafter directing testimony to be taken in order to determine whether the defendant was unable, because of insanity, to assist counsel with his defense, conclusively evinces that the court was made aware that the defendant's failure to answer to the indictment was very likely the product of the defendant's diseased mental state, and not the result of obstinacy. For if, as the trial judge believed, at the time, there was sufficient proof before him to provoke an inquiry as to the defendant's ability to confer rationally with counsel, then such proof was equally sufficient to either halt the taking of the plea, or if the court was in doubt, to submit the question to a jury. To adopt any other course would result in an evasion of a clear statutory mandate, and thus deprive the accused of having his mental state determined by a jury. A court cannot properly substitute its determination in such a case for that of a jury. It can-

not be successfully urged that no harm was done to the accused, in that he subsequently was afforded a jury trial on the question of his mental condition at the time of the commission of the deed. But that fact cannot cure the error which deprived the defendant of his constitutional right to a fair trial. A court may not ignore a statute which in unequivocal language is intended to safeguard the mentally afflicted accused of crime against inhuman oppression, and be permitted to justify such action by pointing to the fact that the accused had the question of his guilt or innocence subsequently passed upon by a jury. If such a course of procedure be sanctioned it will soon throttle the liberties of the people, make the right of trial by jury a farce and produce a chaotic condition in the administration of the criminal law. To reverse on the ground of the alleged error discussed does not leave the prosecution remediless, as was suggested by counsel of the state.

The result would be to restore to the defendant a status such as he possessed before the plea of not guilty was entered in his behalf, by the direction of the court.

I am also of the view that the trial judge erred in limiting the jury, on the evidence in the cause, to a finding of a verdict of murder in the first degree if the jury found the defendant guilty of murder.

In *State* v. *Warner,* 56 *N. J. L.* 686, Mr. Justice Reed, speaking for this court (at *p.* 690), says: "The exceptional immunity extended to the drunkard is limited to those instances where the crime involves a specific actual intent. When the degree of intoxication is such as to render the person incapable of entertaining such intent it is an effective defense."

In the later case, *Wilson* v. *State,* 60 *N. J. L.* 171, this court, in an opinion by Mr. Justice VanSyckel, declared: "If by law, deliberation and premeditation are essential elements of the crime, and, by reason of drunkenness *or any other cause,* it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed."

The law is not the creation of such barbarous and insensible animal nature as to extend a more lenient legal rule to the case of a drunkard, whose mental faculties are disturbed by his own will and conduct, than to the case of a poor demented creature afflicted by the hand of God. This subject was fully discussed by me in a dissenting opinion in *State* v. *Martin, ante, p.* 388. Moreover, a review of the cases cited on this topic clearly indicate that the legal rule as applied to the drunkard charged with the commission of murder, relating to the degree of guilt, is equally applicable to the mentally afflicted. If the case of State *v.* Martin holds a contrary view, it is a distinct and deplorable departure from the legal rule enunciated by this court in *Wilson* v. *State, supra,* and *State* v. *Warner, supra.*

*For affirmance*—BLACK, J.  1.

*For reversal*—THE CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, KATZENBACH, CAMPBELL, GARDNER, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, JJ.  12.